# Illinois Official Reports

## Appellate Court

---

### *People v. Cherry*, 2020 IL App (3d) 170622

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TREMAYNE CHERRY, Defendant-Appellant. |
| District & No. | Third District<br>No. 3-17-0622 |
| Filed | March 31, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 14-CF-1909; the Hon. Carla A. Policandriotes, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd and Peter A. Carusona, of State Appellate Defender's Office, of Ottawa (William L. Breedlove, of Breedlove Legal, LLC, of Moline, of counsel), for appellant.<br><br>James W. Glasgow, State's Attorney, of Joliet (Patrick Delfino, Thomas D. Arado, and Richard T. Leonard, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

Panel                    JUSTICE McDADE delivered the judgment of the court, with opinion.
                         Justice O'Brien concurred in the judgment and opinion.
                         Justice Wright specially concurred, with opinion.


**OPINION**

¶ 1      Defendant, Tremayne Cherry, appeals following his conviction for unlawful use of a weapon by a felon. He argues that the circuit court erred in denying his motion to suppress evidence. He also contends that the court committed structural error in denying his right to proceed as a self-represented litigant. We affirm.


¶ 2                                    I. BACKGROUND

¶ 3      The State charged defendant with unlawful use of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2014)) and possession of a firearm without the requisite Firearm Owner's Identification Card (430 ILCS 65/2(a)(1), 14(c)(3) (West 2014)). Defendant filed a motion to suppress evidence.

¶ 4      At the hearing on defendant's motion, Officer James Kilgore testified that he and Officer Jeff Haiduke were dispatched to the vicinity of Illinois and Morgan Streets at approximately 6 p.m. on September 25, 2014. Kilgore learned from dispatch that a tip had been made to the Joliet Police Department, referencing, in Kilgore's words, "a vehicle that was occupied by *** one or two male blacks *** holding a large firearm out of a window pointing [it] at people." Kilgore testified that he did not know whether the tip was anonymous, stating: "I'm not sure if the caller gave her name or not but I just know we were dispatched to it." The tip also provided a description of the vehicle, including the license plate number.

¶ 5      Kilgore and Haiduke proceeded to the area in question and were able to locate the vehicle, a white Corsica. The vehicle was unoccupied. Kilgore testified that he and Haiduke parked their unmarked squad car 50 to 75 yards away and began surveillance. During that time, Kilgore ran the license plate number through a computer system and was able to retrieve a photograph of the registered owner of the vehicle.

¶ 6      Kilgore testified that, after approximately 15 minutes of surveillance, he observed "two or three males" walking toward the parked vehicle. Defense counsel then asked if it could possibly have been more than three people. Kilgore responded: "I believe so." Kilgore recognized a "taller male black individual" as the owner of the vehicle. He identified that person as defendant. Kilgore testified that defendant "opened the door quickly, reached in. We couldn't see what for and closed the door and walked back on the sidewalk." After refreshing his memory with his report, however, Kilgore testified that two or three of the men "entered the vehicle."

¶ 7      Kilgore did not observe anyone remove anything from the vehicle. The group of men then began walking southbound on Illinois Street. Kilgore observed defendant holding his waistband with one hand while he walked. Kilgore could not recall if defendant was wearing baggy pants, but conceded it was possible defendant was holding his pants up. Defendant had not been holding his waistband before entering the vehicle. Noting that they were in a "high

- 2 -

crime area," Kilgore testified that he decided to stop the group on the belief that defendant might be carrying a firearm.

¶ 8 Kilgore activated the emergency lights on the squad car and pulled up to the group. He and Haiduke exited the vehicle and ordered the men to stop. Kilgore testified that he intended to perform a *Terry* stop[1] and pat defendant down for weapons. He did not remove his gun from his holster. Kilgore testified: "When I attempted to pat down the defendant, he took off running southbound." Kilgore tackled defendant soon thereafter and placed him into custody. Kilgore estimated that defendant ran 10 feet before being tackled. Kilgore felt a gun in defendant's waistband when he tackled him. Kilgore was able to retrieve the firearm, which he described a black .45-caliber handgun.

¶ 9 Through a series of recross- and redirect examinations, Kilgore described in great detail the precise sequence of events leading up to defendant's flight. He testified that, before running, defendant took two steps backwards while continuously looking to his left and right. On recross-examination, the prosecutor asked: "After you asked the defendant to stop and he said yes, you moved to engage with him, he ran from you?" Kilgore responded: "Yes, that's correct." Kilgore next clarified that defendant ran after Kilgore had exited the squad car and begun approaching defendant. Defendant took two steps backward before Kilgore even began approaching him. He testified that the group of men stopped at some point before defendant ran.

¶ 10 The circuit court found that there had been reasonable, articulable suspicion to stop the group of men coming from the vehicle. Accordingly, the court denied defendant's motion.

¶ 11 After the hearing on defendant's motion but prior to his trial, defendant filed a "motion to withdraw counsel and for leave to proceed *pro se.*" In the motion, defendant expressed unhappiness with the representation he had received from his assistant public defender. Appearing in court on that motion, defendant explained: "As of right now, *** me and my family is looking at other options, but I told my mother that I would be going *pro se* right now but we are looking at other options." He clarified that his family was attempting to find money to hire a new lawyer, that defendant was unsure whether those attempts would be successful, and that he wished to proceed *pro se* at least for the time being.

¶ 12 The court questioned defendant concerning his education and legal experience, and it explained the serious nature of the felony charges against him. The court then conducted the following inquiry:

"THE COURT: You suggested to me that you spoke to your mother about it, right?

THE DEFENDANT: Yes.

THE COURT: I doubt she is on board because if she knows the nature of the potential consequences here on the one that is already set for trial it is a Class 2, unlawful use of a weapon."

The court expressed skepticism concerning defendant's choice to proceed *pro se* and explained that it would not be able to assist him at a trial. It urged him to not accept advice from people in the jail.

---

[1]On redirect examination, Kilgore testified that he *did* perform a *Terry* stop.

¶ 13 The court concluded: "I will not grant your request today. I will leave your pleadings on file." The court set a date for four days later, explaining that it would provide defendant an opportunity to consult with his family and defense counsel further.

¶ 14 At the next court date, defense counsel indicated that defendant wished to withdraw his motion to proceed *pro se*. Defendant confirmed that representation.

¶ 15 Following a stipulated bench trial, the court found defendant guilty on both counts. The court sentenced defendant to 4½ years' imprisonment for unlawful possession of a weapon by a felon, entering only one sentence pursuant to the one-act one-crime doctrine.

¶ 16                                    II. ANALYSIS

¶ 17 On appeal, defendant argues that the circuit court erred in denying his motion to suppress evidence. He also argues that the court "committed structural error in denying defendant the right to proceed *pro se*." We address each argument in turn.

¶ 18                               A. Motion to Suppress

¶ 19 The fourth amendment to the United States Constitution and article I, section 6, of the Illinois Constitution protect individuals from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. As a general matter, a search or seizure is reasonable where it is conducted pursuant to a warrant supported by probable cause. *People v. Jones*, 215 Ill. 2d 261, 269 (2005). Warrantless searches or seizures are considered unreasonable and in contravention of the federal and state constitutions unless they fall under one of a few well-defined exceptions to the general rule. *People v. Colyar*, 2013 IL 111835, ¶ 85.

¶ 20 One recognized exception to the warrant requirement was first set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). In *Terry*, the United States Supreme Court held that a police officer may conduct a brief, investigative stop of a person when the officer has reasonable, articulable suspicion that the person had committed or is about to commit a crime. *Id.* at 21-22; *People v. Timmsen*, 2016 IL 118181, ¶ 9. "Although 'reasonable, articulable suspicion' is a less demanding standard than probable cause, an officer's suspicion must amount to more than an 'inchoate and unparticularized suspicion or "hunch" ' of criminal activity." *Timmsen*, 2016 IL 118181, ¶ 9 (quoting *Terry*, 392 U.S. at 27).

¶ 21 When reviewing the circuit court's ruling on a motion to suppress evidence, we apply a two-part standard of review. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). Findings of fact made by the circuit court are reviewed for clear error and only reversed if they are against the manifest weight of the evidence. *Id.* However, the ultimate decision of whether suppression is warranted is a question of law that is reviewed *de novo*. *People v. Harris*, 228 Ill. 2d 222, 230 (2008). As there is no dispute between the parties regarding the underlying facts in the present case, our analysis may proceed *de novo*.

¶ 22                               1. Initial Encounter

¶ 23 Defendant contends that Kilgore did not have the reasonable, articulable suspicion required to conduct a *Terry* stop at the time Kilgore ordered defendant and his associates to stop. He argues that Kilgore's command to the group of men was just that—a command, rather than a request—and that the encounter must therefore be considered a *Terry* stop for fourth amendment purposes. He points out that Kilgore testified that it was his intent to effectuate a

*Terry* stop. Thus, defendant maintains that reasonable, articulable suspicion was required at that moment in time, rather than after defendant had fled.

¶ 24 We agree that Kilgore, at the moment identified by defendant, did not have reasonable, articulable suspicion that defendant had committed or was about to commit a criminal offense. An anonymous phone tip[2] may form the basis of a *Terry* stop only where it provides information from which one may conclude that the caller is honest and his information reliable, often referred to as indicia of reliability. *Alabama v. White*, 496 U.S. 325, 329 (1990). "Substantial corroboration [of the tip] would not only establish an informant's veracity, but would also support an inference that an informant obtained his story reliably." *People v. Williams*, 147 Ill. 2d 173, 210 (1991).

¶ 25 Kilgore and Haiduke were able to corroborate certain parts of the tip, namely, that a number of black men were in a white vehicle together. But that corroboration of wholly innocent activity does not lend any particular credibility to the informant's claim that the men possessed a gun. Nor did defendant's holding of his waistband—which Kilgore conceded was not necessarily indicative of any sort of criminal activity—serve to bolster the tip. The vague notion that all of these events occurred in a "high crime area" cannot realistically serve to elevate Kilgore's suspicion in any meaningful way.

## 2. Submission to Authority

¶ 26

¶ 27 While we find that Kilgore did not have the reasonable, articulable suspicion that a crime had been or was about to be committed when he first confronted defendant, that finding does not conclude our analysis. We must also ask whether such suspicion was constitutionally *required* at that particular moment. In other words, was the initial confrontation an encounter of fourth amendment magnitude?

¶ 28 Kilgore testified that his actions did amount to a *Terry* stop. The United States Supreme Court, however, has made clear that an officer's subjective intent alone does not create a fourth amendment encounter. In *California v. Hodari D.*, 499 U.S. 621, 626 (1991), the Court held that a seizure does not occur via a show of authority unless the subject *yields* to that seizure. The Court commented that the fourth amendment "does not remotely apply *** to the prospect of a policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee. That is no seizure." *Id.* Thus, the Court concluded: "An arrest requires *either* physical force *** *or*, where that is absent, *submission* to the assertion of authority." (Emphases in original.) *Id.*

¶ 29 Following *Hodari D.*, a police officer's assertion of authority is only the first step in determining whether a fourth amendment encounter requiring a particular quantum of suspicion has occurred. A court must next consider whether the suspect actually submitted to that assertion of authority. For example, in *People v. Thomas*, 198 Ill. 2d 103, 106-07 (2001), officers attempted to stop defendant, who was riding a bicycle. Defendant continued riding the bicycle, attempting to evade the officers. *Id.* at 107. Eventually, defendant alighted from the

---

[2]Kilgore did not know whether the tip was anonymous, noting that the caller might have left a name. Whether the tip was "anonymous" in this technical sense is unimportant to the analysis; Kilgore had no way of determining the tipster's veracity, reliability, or basis of knowledge from the tip alone, regardless of whether the person gave a name. *Illinois v. Gates*, 462 U.S. 213, 230 (1983).

bicycle and ran into a field, where he was eventually captured. *Id.* Our supreme court, wholly adopting the reasoning of the lower court, held:

> " 'Had the defendant stopped when his path was obstructed, had he submitted to Officer Melton's show of authority, a seizure of the kind offensive to our constitution would have occurred. Officer Melton would have effected an investigatory stop absent the requisite degree of suspicion to support it. The stop would have constituted an unreasonable seizure of the defendant's person. However, Officer Melton's attempt to effect an unlawful stop did not implicate the fourth amendment because the defendant took flight and prevented it.' " *Id.* at 112 (quoting *People v. Thomas*, 315 Ill. App. 3d 849, 857 (2000)).

¶ 30    In cases where a defendant flees immediately from an attempt to effectuate a stop or seizure, such as *Hodari D.* or *Thomas*, it is clear that there has been no submission to authority and thus no fourth amendment encounter. The question becomes more complex where a court must determine if any "momentary pause before fleeing constitutes a seizure under the Fourth Amendment." *United States v. Jeter*, 721 F.3d 746, 752 (6th Cir. 2013). While that distinction may turn on minute details, the consequences are substantial. As we have seen, if a suspect flees immediately, officers need only have reasonable suspicion at the moment they actually catch and detain the suspect. *E.g.*, *Hodari D.*, 499 U.S. at 629. If, however, it is determined that a suspect first submitted to authority, *then* took flight, any evidence found after the initial encounter may be excluded, subject to the fruit-of-the-poisonous-tree and attenuation doctrines. See *People v. Henderson*, 2013 IL 114040, ¶¶ 30-50.

¶ 31    The United States Supreme Court has explained that "what may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away." *Brendlin v. California*, 551 U.S. 249, 262 (2007). In *People v. Jackson*, 389 Ill. App. 3d 283, 284 (2009), a police officer approached the defendant and ordered him " 'three to four times' " to remove his hands from his pockets. When the defendant did eventually remove his hands, a revolver fell out of his pocket. *Id.* The defendant then fled. *Id.* at 285. The First District found that the officer's command was mandatory in nature and that the defendant's act of removing his hands in compliance with that order amounted to submission to authority. *Id.* at 288. Having found that there was no constitutional basis for the stop, the court concluded that the revolver should be excluded from evidence. *Id.* at 289.

¶ 32    A number of lower federal courts have determined that a brief or momentary pause prior to flight does not amount to submission to authority. *E.g.*, *Jeter*, 721 F.3d at 752-53; *United States v. Hernandez*, 27 F.3d 1403, 1407 (9th Cir. 1994); *United States v. Baldwin*, 496 F.3d 215, 219 (2d Cir. 2007). However, a momentary yield, accompanied by more, such as an attempt to converse with the officer, may amount to a submission. See *United States v. Morgan*, 936 F.2d 1561, 1565, 1567 (10th Cir. 1991) (finding submission where defendant replied " 'What do you want?' " to officer's command to stop, before fleeing); *cf. United States v. Valentine*, 232 F.3d 350, 353, 359 (3d Cir. 2000) (finding defendant's response of " 'Who, me?' " prior to flight insufficient to show submission).

¶ 33    We find that defendant in the present case did not submit to Kilgore's show of authority. Kilgore's testimony indicated that defendant was already taking steps backward and away from Kilgore as Kilgore was alighting from his squad car. Defendant then took full flight as Kilgore began to approach him. There was no testimony concerning how long—if at all—defendant

and his companions stopped walking as the squad car approached with its lights activated. But if Kilgore was positioned only 50 to 75 yards away, that could not have been any significant amount of time. There was no testimony that defendant indicated through actions or words that he was submitting to the stop. We note that Kilgore did respond affirmatively to a question in which the prosecutor suggested that defendant said "yes" when Kilgore "asked" him to stop. Even assuming this is true, defendant's utterance of the word "yes," apparently spoken while backing away from Kilgore and just prior to fleeing outright, cannot be considered a submission to authority in any meaningful way.

¶ 34    Because defendant never submitted to Kilgore's command to stop, that initial encounter does not rise to a level of constitutional magnitude. See *Hodari D.*, 499 U.S. at 626. It follows that Kilgore's lack of reasonable, articulable suspicion at that moment did not render his actions unconstitutional.

¶ 35                            3. Postflight Reasonable, Articulable Suspicion

¶ 36    Of course, it is unquestionable that defendant was seized for fourth amendment purposes when Kilgore tackled him. Thus, we must next determine whether Kilgore had the requisite quantum of suspicion at that moment.

¶ 37    In *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000), the United States Supreme Court held that unprovoked flight from the police is relevant in establishing reasonable suspicion. The Court noted that it had previously "recognized that nervous, evasive behavior" was a pertinent factor. *Id.* (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975)). The *Wardlow* Court went on to conclude: "Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Id.* The Court emphasized that, when an officer without reasonable suspicion or probable cause approaches an individual, the individual remains free to go about his business. *Id.* at 125. But, the Court opined, "unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite." *Id.*

¶ 38    Applying *Terry* principles, the *Wardlow* Court concluded that "officers confronted with such flight [may] stop the fugitive and investigate further." *Id.* More recently, the Court in *District of Columbia v. Wesby*, 583 U.S. ___, ___, 138 S. Ct. 577, 587 (2018), held that " 'deliberately furtive actions and flight at the approach of … law officers are *strong* indicia of *mens rea*.' " (Emphasis in original.) (quoting *Sibron v. New York*, 392 U.S. 40, 66 (1968)).

¶ 39    Some courts have found, following *Wardlow*, that flight *alone* is insufficient to establish reasonable suspicion to detain a suspect. *E.g.*, *United States v. Bonner*, 363 F.3d 213, 217 (3d Cir. 2004) ("[F]light upon noticing police, plus some other indicia of wrongdoing, can constitute reasonable suspicion."); *People v. Hyland*, 2012 IL App (1st) 110966, ¶ 32. Our own supreme court seems to have rejected this notion, however, holding that "[u]nprovoked flight in the face of a potential encounter with police *may* raise enough suspicion to justify the ensuing pursuit and investigatory stop." (Emphasis added.) *Thomas*, 198 Ill. 2d at 113.

¶ 40    In any event, defendant's unprovoked flight[3] in the present case did not stand alone. Kilgore had observed defendant holding his waistband after briefly entering the vehicle, having

_____

[3]Defendant makes no argument that his flight was "provoked." While it has been suggested that flight may be considered provoked in situations involving fraud or reasonable fear of imminent harm (*Jeter*, 721 F.3d at 753), neither such situation is applicable here.

not previously been holding his waistband. Kilgore was aware of a tip that a group of black men in that vehicle had been displaying a firearm. As we explained above, those facts alone were insufficient to form the requisite reasonable, articulable suspicion to conduct a *Terry* stop. *Supra* ¶¶ 24-25. However, defendant's flight was a *strong* indication of his guilty state of mind. *Wesby*, 583 U.S. at ___, 138 S. Ct. at 587. The combination of those circumstances provided Kilgore, at the very least, with the reasonable suspicion required to pursue defendant and continue his investigation. See *Wardlow*, 528 U.S. at 125.

¶ 41                                                    4. Frisk

¶ 42     Defendant argues separately that Kilgore's "attempted *Terry* frisk" during their initial encounter was unconstitutional. Of course, that frisk never actually occurred and thus should not be subjected to a fourth amendment analysis. Indeed, it appears that Kilgore never needed to conduct a *Terry* frisk, even after tackling defendant. Kilgore testified that, upon tackling defendant, he felt a gun in defendant's waistband—precisely where he suspected the gun was located. At that point, without needing to resort to a formal *Terry* frisk, the gun could be legally seized under the plain touch doctrine. See *People v. Mitchell*, 165 Ill. 2d 211, 223 (1995); *People v. Wright*, 41 Ill. 2d 170, 174 (1968) ("[P]lain view doctrine has been applied to anything which an officer becomes aware of by use of his five senses while in a lawful position.").

¶ 43                         B. Right to Proceed as a Self-Represented Litigant

¶ 44     Finally, defendant argues that the court committed structural error in denying defendant his right to proceed as a self-represented litigant. This argument is not supported by the record. The court did not deny defendant's motion to proceed as a self-represented litigant. Rather, the court explicitly held defendant's motion open after encouraging him to discuss his decision further with his family and with appointed counsel. When defendant appeared in court four days later, defendant withdrew his motion. There is thus no ruling for this court to consider.

¶ 45                                               III. CONCLUSION

¶ 46     The judgment of the circuit court of Will County is affirmed.

¶ 47     Affirmed.

¶ 48     JUSTICE WRIGHT, specially concurring:

¶ 49     I specially concur. I agree with the majority's conclusion that the trial court properly denied the motion to suppress because there were reasonable and articulable grounds for the *Terry* stop that followed defendant's headlong flight from the approaching officers. I also agree structural error is not present in this record.

¶ 50     Respectfully, unlike the majority, I believe the officers had a reasonable and articulable basis for an investigative *Terry* stop before defendant's immediate flight from the scene. I believe the officers' visual corroboration of details included in the tip, such as the location and description of the vehicle, combined with the officers' observations of conduct consistent with the retrieval of a firearm from the vehicle and concealment of that firearm on defendant's person, provided the officers with a reasonable, articulable basis to conduct a *Terry* stop before

flight. Even though I agree with the majority that a *Terry* stop did not materialize until after defendant's headlong flight, I respectfully disagree with that portion of the discussion regarding defendant's preflight activities as insufficient to warrant a brief investigatory *Terry* stop.