2021 IL App (2d) 181039-U
No. 2-18-1039
Order filed February 23, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-1848 |
| TOMMY BARNETT, | ) ) ) | Honorable Donald M. Tegeler Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*: Denial of defendant's motion to suppress was not erroneous where the police officer seized defendant after—not before—he ran from the officer during a consensual encounter, and, thus, defendant's flight was a proper factor in judging the lawfulness of the seizure. Together with other circumstances then known to the officer, defendant's flight justified the seizure.

¶ 2    Defendant, Tommy Barnett, appeals from the denial of his motion to suppress evidence and his consequent conviction of possession of a firearm while ineligible for a firearm owner's identification (FOID) card (430 ILCS 65/2(a)(1) (West 2016)). He contends that a Carpentersville police officer unlawfully seized him by grabbing at his arm during a consensual encounter that

was not based on evidence sufficient to support a *Terry* stop (see *Terry v. Ohio*, 392 U.S. 1 (1968)). He argues that his flight, which he contends occurred after the officer grabbed at him, was "lawful flight after an unlawful detention" and thus did not justify the stop. We conclude that the trial court was not manifestly incorrect to find that the officer grabbed at defendant "when [he] made the move to run"; defendant's flight can thus properly be deemed part of the justification for the seizure. We further conclude that the seizure was justified under the circumstances. We, therefore, affirm the denial of the motion and defendant's consequent conviction.

¶ 3                                    I. BACKGROUND

¶ 4      A grand jury indicted defendant on one count of possession of a firearm while ineligible for a FOID card (430 ILCS 65/2(a)(1) (West 2016)), one count of unlawful use of a weapon (720 ILCS 5/24-1(a)(4) (West 2016)) (unlawfully carrying a concealed weapon while in public housing when not a resident or other person authorized to be on the property); and four counts of aggravated unlawful use of a weapon (720 ILCS 5/24-1.6(a)(1), (a)(3)(A); 24-1.6(a)(1), (a)(3)(A-5); 24-1.6(a)(1), (a)(3)(C); 24-1.6(a)(1), (a)(3)(G) (West 2016)). Defendant moved to suppress certain evidence against him—notably including the discovery of a handgun in a leg of his pants—as the result of an improper seizure.

¶ 5      At the suppression hearing, defendant testified that, a little after midnight on September 24, 2017, he was sitting near the bottom of the outdoor steps of the 4 Middlesex apartment building in Carpentersville, playing a game on his phone. He was wearing a black T-shirt over a longer white T-shirt; he had a handgun with an extended magazine tucked into the front of his pants' waistband under his shirts.

¶ 6      Defendant heard footsteps behind him and, turning, saw a uniformed police officer coming down the steps. The officer asked him what his name was, and he responded, "Jay." The officer

got in front of him and said, " 'Give me your ID.' " Defendant responded, " 'Am I in trouble?' " The officer seemed very demanding and was blocking him in.

¶ 7    Defendant stood up to get his identification out. The gun fell down one leg of his pants as he stood, but given the length of his shirts, he believed that it would have been impossible for the gun to have been visible to the officer. The officer put his hand on his gun. Defendant "got scared" and "tried to walk away." He took about a step, and the officer grabbed him. He ran, and the officer chased and tackled him. As the officer struggled with him, the officer said, " 'Where is the fucking gun?' " While that was happening, another officer "came out of nowhere."

¶ 8    Defendant agreed that a video recording from a security camera positioned near the steps appeared to accurately represent his encounter with the officer. The video showed defendant sitting at the bottom of a short flight of outdoor stairs. A uniformed male—Officer Ian Abrahamsen of the Carpentersville police—appeared on a porch or landing and started descending the stairs. When he was a few steps down, he paused and, with his right hand, gestured with a small flashlight. He then passed to the left of defendant. As he stepped in front of defendant, he appeared to be attaching his flashlight to his belt on his right side. At about the same time, defendant stood and turned slightly to his left. Abrahamsen moved to stand on defendant's right side. As the two stood side by side, Abrahamsen's right hand shifted to an area near his belt.

¶ 9    Next, defendant shifted slightly, and all but simultaneously, Abrahamsen reached toward him. As Abrahamsen tried to grasp him, defendant ran. Abrahamsen pursued, always maintaining contact or near contact with defendant. Abrahamsen tackled defendant, taking him to the ground near a row of parked cars. As Abrahamsen struggled to control defendant, another officer, whose vehicle started to appear in-frame just as Abrahamsen grabbed for defendant, came to Abrahamsen's aid.

¶ 10    The time elapsed from Abrahamsen standing in front of defendant to defendant's flight is about four seconds.  The camera was above and to the right of most of the action; the video mostly showed defendant and the officer from the back or the side.  The quality of the video is fair; the figures are always visible despite what must have been low light, but the video is not so clear as to permit, for instance, a precise determination of where Abrahamsen's right hand was when he approached defendant.

¶ 11    Abrahamsen testified for the State.  He stated that at about 12:12 a.m. on September 24, he was on patrol in his vehicle in the Fox View Apartments.  "Two female subjects who wished to remain anonymous" approached the open window of his vehicle.  This was unusual because the area was not one in which residents would typically approach the police voluntarily.  He knew one of the women; she had come to him with information before and that information had always been reliable to the best of his recollection.  Both had a serious demeanor.

¶ 12    The woman he did not know spoke first, telling him that a friend of hers had talked to her and had told her that she "was having an issue with a male subject she used to date."  "She said her friend used to date a male who was from Chicago who did not live in Fox View and he was down in Fox View looking for her friend."  "She said he was a male black wearing a black T-shirt and faded blue jeans.  She also stated her friend was afraid of him because he had pulled a gun on her the night before."  When Abrahamsen asked her where the man was, "[s]he pointed in the direction of the 4 Middlesex apartment building and the 7 Oakhurst Apartment building."  The second woman, the one whom Abrahamsen knew, stated that the man was "sitting in a staircase which leads up to her apartment at the 4 Middlesex building."

¶ 13    After announcing his destination on the radio, Abrahamsen parked his vehicle near the 4 Middlesex building and set out on foot to look for the man described.  He passed through the

building, and, exiting, found a person exactly as described in the place the second woman said that he would be. As he walked down the stairs, he used his flashlight to signal to other officers where he was. He addressed the man on the stairs, saying, " 'How are you doing? What is your name?' " The man said that he was "Jay." As Abrahamsen circled to stand in front of the man, he said, " 'Okay. Jay, can I see your identification?' " However, on cross-examination, he agreed that the words that he had used were, " 'I just need to see your ID.' " "The subject stood up. And as he stood up, he looked away." As he stood, Abrahamsen "saw the butt of a pistol sticking out of his front waistband."

> "As he stood up, I was facing him. We had eye contact. He had looked to his left. And then as he looked to the left, I looked at this waistband. I saw the magazine sticking out of his pants. At that point, he leaned away and he ran."

Abrahamsen clarified that he "believed [that defendant] was about to flee" when defendant glanced away and shifted his weight in that same direction. Abrahamsen grabbed defendant, intending to get control of defendant's arms and hands. Abrahamsen said that, during the entire encounter, he neither drew his service pistol—which he kept holstered on his right side—nor gestured as if to draw it.

¶ 14    Reviewing this evidence, the court found, contrary to what defendant argued, that defendant first became aware of another officer's presence after defendant fled and that officer came to Abrahamsen's aid. Further, the video did not show whether Abrahamsen ever put his hand on his gun but did show that the gun remained holstered at all times. The court found that Abrahamsen said something to the effect of "What is your name? I need your ID." The court noted, "Requesting an ID—you know, 'Give me your ID' or 'please give me your ID' is different

than, 'We need to talk.' " Further, "there is no question the defendant is not complying at that point."

> "The defendant [then] stands up. I see almost simultaneously as the defendant moved to defendant's left the officer reached his hand out, makes contact. And that is when the defendant is running. The defendant is therefore tackled about 40 feet away, possibly, in this case."

The court did not believe defendant's testimony that Abrahamsen tapped his gun or acted as if to draw it. Moreover, "[t]he touching [of defendant by Abrahamsen] occurred *** when the defendant made the move to run." However, Abrahamsen "was not able to stop him at that point."

¶ 15 The court concluded that the video did not show whether defendant's weapon was visible as he stood, but the court would "take [Abrahamsen] at his word [on] this point." The court also credited Abrahamsen's testimony that he had taken a conversational tone with defendant.

¶ 16 The court ruled that, based on Abrahamsen's earlier conversation with the two women, Abrahamsen "did have a reason to go and do a cursory investigation to see if the person they identified, who happened to be wearing the same clothes as the defendant at the same place they identified, may or may not be doing something." Though the court found that no seizure occurred before defendant's flight, the court noted that Abrahamsen would have been justified in patting down defendant for weapons when he first encountered defendant:

> "I find it interesting—at that point, under *Terry*, he probably would have had an opportunity to demand a pat down—he didn't even do that. He was simply asking for identification at that point."

The court concluded that, because Abrahamsen's request for ID was not a seizure, suppression was not required.

¶ 17    The court suggested that, in the alternative, the stop was justified by defendant's flight:

"So the finding of this Court is, number one, that there was not a seizure [at the start of the encounter] *** , therefore, the motion would be denied.

If an Appellate Court finds that there is a seizure at this point, I would urge the Appellate Court to read the case of [*People v. Thomas*, 198 Ill. 2d 103 (2001)] because I believe in this case the defendant acted exactly as the defendant did in *Thomas* and that by running he, therefore, allowed the investigatory stop, even though it may have been improper, to continue and, at that point, the police officers acted properly. And therefore it would be denied under those circumstances also."

¶ 18    After the trial court's unfavorable ruling, defendant agreed to a stipulated bench trial. The evidence to which the parties stipulated was the security camera video, a photograph of the handgun recovered from defendant with a nonstandard long magazine displayed alongside it, a photograph of three unfired rounds of ammunition and the rounds themselves, documentation of defendant's misdemeanor domestic violence conviction in 2017, and documentation that he had neither a FOID card nor an Illinois concealed-carry license. The parties also stipulated to certain testimony, including testimony by Abrahamsen consistent with his testimony at the suppression hearing. They further stipulated that defendant lived in Chicago and that he was ineligible for a FOID card or a concealed-carry license.

¶ 19    The court found defendant guilty of possession of a firearm while ineligible for a FOID card. The State nolle prossed the unlawful-use-of-a-weapon count because, as charged, it required evidence that the offense occurred in public housing, which the Fox View Apartments were not. The court found defendant not guilty of one count of one aggravated-unlawful-use-of-a-weapon count that required possession of a firearm *other than* a handgun, but found him guilty of the

remaining aggravated-unlawful-use-of-a-weapon counts. However, it ruled that the aggravated-unlawful-use-of-a-weapon counts merged with the conviction of possession of a firearm while ineligible for a FOID card.

¶ 20    Defendant filed a posttrial motion seeking an acquittal or a new trial. He contended that the court erred in denying the suppression motion, because "[it] should have found that Officer Abrahamson [*sic*] seized [defendant] without reasonable suspicion, and that the evidence that followed the illegal seizure should have been suppressed under the fruit of the poisonous tree doctrine." The court denied the motion without comment. The court sentenced defendant to two years' imprisonment, the minimum sentence, commenting that it would give him probation if that were a possibility. Defendant timely appealed.

¶ 21                                  II. ANALYSIS

¶ 22    On appeal, defendant argues that Abrahamsen lacked the reasonable, articulable suspicion needed for a proper investigatory stop of the type described in *Terry*. Defendant concedes that Abrahamsen's request for identification was not a stop, but asserts instead that the stop took place "when Officer Abrahamsen attempted to grab [him] by the arm as he tried to walk away." He argues that the statements that the two informants made to Abrahamsen were insufficient to justify a *Terry* stop. Further, the mere fact that Abrahamsen saw that he had a concealed firearm did not justify the stop, as a concealed firearm is legal when properly licensed. Finally, relying on cases such as *People v. Shipp*, 2015 IL App (2d) 130587, ¶¶ 48-56, which hold that a subject's flight after an officer has made an unlawful *Terry* stop cannot, without more, convert the unlawful stop into a lawful one, he argues that his flight did not provide a basis to stop him. He thus contends that his flight was "lawful flight after an unlawful detention." Specifically, he contends that his movement away from Abrahamsen turned into flight only *after* Abrahamsen seized him by

grabbing at him, such that "Abrahamsen [unlawfully] restricted [his] liberty when he simply leaned to the side." Given this argument, the primary issue here is a factual one: which came first, defendant's flight or Abrahamsen's grab?

¶ 23    We conclude that the trial court was not manifestly wrong in concluding that the flight came before the stop—Abrahamsen grabbed "when the defendant made the move to run." Further, although the trial court did not fully explain its reasoning on the point, we conclude that Abrahamsen had reasonable suspicion on which to base a *Terry* stop after defendant moved to flee.

¶ 24    The fourth amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. Generally, a search or seizure requires probable cause, but the United States Supreme Court, in *Terry*, recognized a limited exception to the probable-cause requirement: in proper circumstances, a law enforcement officer may briefly detain a person for investigatory purposes. *Thomas*, 198 Ill. 2d at 108-09 (citing *Terry*, 392 U.S. at 22). The officer may stop a person for temporary questioning if he or she "reasonably believes that the person has committed, or is about to commit, a crime." *Thomas*, 198 Ill. 2d at 109 (citing *Terry,* 392 U.S. at 22). A *Terry* stop must be justified at its inception. *Thomas*, 198 Ill. 2d at 109.

¶ 25    A court considering a suppression motion should decide whether, based on the facts available to the law enforcement officer, the action was objectively appropriate. To justify a *Terry* stop's intrusion, the officer "must be able to point to specific and articulable facts which, taken together with rational inferences therefrom, reasonably warrant that intrusion." *Thomas*, 198 Ill. 2d at 109 (citing *Terry,* 392 U.S. at 20-21 and *People v. Long,* 99 Ill. 2d 219, 227-28 (1983)). A *Terry* stop is reasonable when, "[v]iewed as a whole, the situation confronting the police officer

must be so far from the ordinary that any competent officer would be expected to act quickly." *Thomas*, 198 Ill. 2d at 110.

> "The facts supporting the officer's suspicions need not meet probable cause requirements, but they must justify more than a mere hunch. The facts should not be viewed with analytical hindsight, but instead should be considered from the perspective of a reasonable officer at the time that the situation confronted him or her." *Thomas*, 198 Ill. 2d at 110.

"Unprovoked flight in the face of a potential encounter with police *may* raise enough suspicion to justify the ensuing pursuit and investigatory stop." (Emphasis added.) *Thomas*, 198 Ill. 2d at 113. When a subject's flight follows an attempt to investigate an informant's tip that was, by itself, an insufficient basis for an investigatory stop, the flight may increase the suspicion enough to make the stop justified. *Thomas*, 198 Ill. 2d at 113-14.

¶ 26 "Whether an investigatory stop is valid is a separate question from whether a search for weapons is valid." *Thomas*, 198 Ill. 2d at 109. An officer may validly conduct a weapon frisk under *Terry* if he or she has "reason to believe that 'the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others.' " *People v. Flowers*, 179 Ill. 2d 257, 263 (1997) (quoting *Terry,* 392 U.S. at 24). Such a search must be justified by the need to protect the officer and others in the area; it cannot be based on a need to gather evidence. *Flowers*, 179 Ill. 2d at 263.

¶ 27 "A person has been seized within the meaning of the fourth amendment only when, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave." *Thomas*, 198 Ill. 2d at 111. However, a mere show of authority does not effect a seizure unless the person towards whom it is directed submits to it. *Thomas*, 198 Ill. 2d at 112. Rather, a person is "seized," within the meaning of the fourth amendment, by means of

"a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful." *California v. Hodari D.*, 499 U.S. 621, 626 (1991); see also *Thomas*, 198 Ill. 2d at 112 (adopting *Hodari D.*).

¶ 28    We review a ruling on a motion to suppress according to the following standards:

"[T]he trial court's findings of historical fact are reviewed only for clear error, giving due weight to any inferences drawn from those facts by the fact finder, and reversal is warranted only when those findings are against the manifest weight of the evidence.  [Citation.] However, a reviewing court remains free to undertake its own assessment of the facts in relation to the issues and may draw its own conclusions when deciding what relief should be granted.  [Citation.]  A trial court's ultimate legal ruling as to whether suppression is warranted is subject to *de novo* review.  [Citation.]" *People v. Hackett*, 2012 IL 111781, ¶ 18.

To the extent that the parties contest neither the facts nor the credibility of the witnesses, "the determination of whether there is reasonable suspicion warranting an investigatory stop is a legal question which a reviewing court may consider *de novo*." *Thomas*, 198 Ill. 2d at 108.

¶ 29    We affirm the motion's denial and thus defendant's conviction.  Defendant's argument here is narrower than that which he made in the trial court.  He admits that his encounter with Abrahamsen was not a seizure until Abrahamsen tried to grab him.  He does not dispute that Abrahamsen saw the gun in his waistband.  He does not dispute that he "leaned to the side" before Abrahamsen grabbed him.  His claim for reversal rests on a single argument: that Abrahamsen's seizure of him preceded his flight and that the evidence available to Abrahamsen before his flight was insufficient to justify the seizure.  We reject this claim as inconsistent with the court's properly supported findings of fact.

¶ 30     We note that the trial court's analysis of the seizure's legality largely stopped with its conclusion that Abrahamsen's request to defendant for identification did not effect a stop. However, the court's alternative analysis implied that, once defendant fled, Abrahamsen had a proper basis for a stop, but the court's reasoning was not explicit. We conclude that, although the court did not develop its reasoning, its conclusion was supported by the evidence.

¶ 31     Turning to defendant's claim that he was seized before he fled, we conclude the court did not commit manifest error when it found that defendant was *in the process of fleeing* when Abrahamsen grabbed him. Specifically, the trial court found that Abrahamsen grabbed defendant "when the defendant made the move to run." This was consistent with the testimony and the video evidence. The video, which, as we noted, is of fair quality at best, shows only what one might interpret as a slight, rapid, shift in defendant's posture at the relevant time. But both Abrahamsen and defendant described what happened in terms consistent with the court's finding. Defendant testified that, during his encounter with Abrahamsen, he "got scared" and "tried to walk away." Abrahamsen then grabbed him after he took about a step. Abrahamsen testified that, when he saw defendant look away and lean in the same direction, he grabbed defendant "[b]ecause [he] believed [that defendant] was about to flee." Thus, both recognized the shift in posture as the initial stage of flight.

¶ 32     Defendant states that Abrahamsen admitted that he grabbed defendant when he was "about to flee" and suggests that we should distinguish between being "about to flee" and fleeing—or, in the trial court's terms, between "ma[king] the move to run" and running. That distinction is artificial and would produce harmful consequences. As we noted, a *Terry* stop is reasonable when, "[v]iewed as a whole, the situation confronting the police officer must be so far from the ordinary that any competent officer would be expected to act quickly." *Thomas*, 198 Ill. 2d at 110. If, from

the officer's perspective, a subject appears to be "ma[king] the move to run," it is not reasonable to expect the officer to wait until the subject has a foot off the ground—or whatever measure that we might adopt for when "actual" flight starts—before acting to stop the subject. Particularly when it is likely that a subject is carrying a firearm, we would expect an officer to act quickly to avoid the subject gaining a position from which he or she might open fire. An officer need not give a fleeing subject a running start for a seizure based on fleeing to be proper. Moreover, the actions that we would need to distinguish occur over small fractions of seconds—too brief for any plausible planning. In any event, the relevant actions here happened so rapidly that we think it implausible that defendant's shifting and running were anything but a single impulse. To say that defendant leaned *and then* Abrahamsen grabbed *and then* defendant ran misses the continuity of the action. The trial court had a proper basis to conclude that defendant acted and Abrahamsen reacted.

¶ 33 Because Abrahamsen seized defendant after he fled, several cases on which defendant relies, notably *Shipp* and *People v. Flunder*, 2019 IL App (1st)171635, are inapposite. As we noted, *Shipp* holds that a subject's flight after an officer has made an unlawful *Terry* stop cannot by itself convert the unlawful stop into a lawful one. *Shipp*, 2015 IL App (2d) 130587, ¶¶ 48-56. Having concluded that the flight preceded the seizure, we need not further address *Shipp*. *Flunder* similarly is inapplicable; *Flunder* concerns a frisk of a subject who was with his vehicle at a gas pump, who complied with all police instructions, and who did not flee. *Flunder*, 2019 IL App (1st) 171635, ¶ 13.

¶ 34 Because Abrahamsen seized defendant after defendant started fleeing, the propriety of that seizure must be addressed under the precedent relating to seizures after flight. A subject's flight when approached by law enforcement officers can combine with such bases for suspicion that

existed before the flight to create the reasonable suspicion to justify a *Terry* stop. *Thomas*, 198 Ill. 2d at 113-14. Here, as we noted, we need not address whether a basis for a stop existed *before* defendant fled; it is sufficient to conclude that a basis existed *when* he fled.

¶ 35    The statements by the two informants, whether or not they by themselves established such suspicion, clearly *contributed to* establishing such suspicion. The two told Abrahamsen that their friend "was having an issue with a male subject she used to date." Her friend was afraid of the man because he had pulled a gun on her the night before. The man was "from Chicago[,] did not live in Fox View[,] *** *was down in Fox View looking for her friend*," and was currently sitting on the steps of a nearby apartment building. (Emphasis added.) Although defendant argues that these statements were relevant only to suggest that defendant had committed an assault the previous night, that claim is unreasonable. The statements plainly implied that defendant might be armed and lying in wait for the friend; Abrahamsen reasonably could treat the circumstances as exigent. Abrahamsen then confirmed that defendant was where one informant said that he would be and that he had a gun, suggesting that the informants' statements were based on reliable information. Defendant's flight added to that suspicion, suggesting that defendant had a guilty conscience due either to his actions the night before or his awareness that his weapon was illegal, or both.

¶ 36    The facts here are similar to those in *People v. Cherry*, 2020 IL App (3d) 170622, in which a Third District panel concluded that a subject's flight justified a stop. At the suppression hearing in *Cherry*, a Joliet police officer, James Kilgore, testified that he and a fellow officer received a dispatch based on a tip provided to the police department. According to the tipster, a black male— one of the possibly several black male occupants of a white Corsica with a specified license number—had been seen pointing a firearm at people out of the car's window. Kilgore did not

know whether the tip was anonymous. *Cherry*, 2020 IL App (3d) 170622, ¶ 4. The officers found the specified car unoccupied and parked in what Kilgore considered a " 'high crime area.' " *Cherry*, 2020 IL App (3d) 170622, ¶¶ 5, 7. They parked at a distance to watch the car; while they were parked, Kilgore retrieved the driver's license photograph of the car's registered owner. *Cherry*, 2020 IL App (3d) 170622, ¶ 5. After about 15 minutes, a group of black males, one of whom appeared to be the car's owner, approached the car. That person—the defendant—opened one of the doors and reached inside. *Cherry*, 2020 IL App (3d) 170622, ¶ 6. As the group walked away, Kilgore saw the defendant holding the waistband of his pants as he walked, something that he was not doing before he stopped at the car. *Cherry*, 2020 IL App (3d) 170622, ¶ 7. Kilgore activated the squad car's emergency lights with intending to conduct a *Terry* stop and to pat the men down for weapons. However, when he tried to perform a pat-down of the defendant, the defendant " 'took off running.' " *Cherry*, 2020 IL App (3d) 170622, ¶ 8. Kilgore tackled him after he had run about 10 feet. During the tackle, Kilgore felt a gun near the defendant's waistband; it proved to be a .45 caliber handgun. *Cherry*, 2020 IL App (3d) 170622, ¶ 8.

¶ 37 The trial court ruled that Kilgore's *Terry* stop was proper and thus denied the suppression motion. *Cherry*, 2020 IL App (3d) 170622, ¶ 10. After a stipulated bench trial, the court found the defendant guilty of a weapons offense. *Cherry*, 2020 IL App (3d) 170622, ¶ 15. The appellate court affirmed. It concluded that, at the moment that Kilgore initiated the attempted *Terry* stop, he did not have a reasonable, articulable suspicion that the defendant had committed or was about to commit a criminal offense. The problem was that he was acting on an anonymous phone tip: "An anonymous phone tip may form the basis of a *Terry* stop only where it provides information from which one may conclude that the caller is honest and his information reliable," which generally requires that the tip be *substantially* corroborated. *Cherry*, 2020 IL App (3d) 170622,

¶ 24. The only corroboration Kilgore had found for the tip was that several black males were associated with the car described by the tipster; he had no corroboration for the claim that a weapon had been displayed. *Cherry*, 2020 IL App (3d) 170622, ¶ 25. However, although Kilgore *attempted* a *Terry* stop, no such stop occurred: under the rule in *Hodari D.*, no stop occurs until the subject *submits* to police authority, which the defendant did not do. *Cherry*, 2020 IL App (3d) 170622, ¶¶ 28-34. The defendant was thus not seized until Kilgore tackled him. *Cherry*, 2020 IL App (3d) 170622, ¶ 36.

¶ 38 The *Cherry* court found that the defendant's flight, coupled with what had gone before, established reasonable suspicion for the stop. Although the court recognized that flight alone might not justify a stop, it concluded that Kilgore had a stronger basis for suspicion:

> "Kilgore had observed defendant holding his waistband after briefly entering the vehicle, having not previously been holding his waistband. Kilgore was aware of a tip that a group of black men in that vehicle had been displaying a firearm. As we explained above, those facts alone were insufficient to form the requisite reasonable, articulable suspicion to conduct a *Terry* stop. [Citation.] However, defendant's flight was a *strong* indication of his guilty state of mind. [Citation.] The combination of those circumstances provided Kilgore, at the very least, with the reasonable suspicion required to pursue defendant and continue his investigation." (Emphasis in original.) *Cherry*, 2020 IL App (3d) 170622, ¶ 40.

¶ 39 Here, although we make no holding about whether the informant's tip alone would have justified a stop, the circumstances here are similar to those in *Cherry*. The *combination* of the potentially inadequate tip, Abrahamsen's spotting the butt of a gun at defendant's waist, and

defendant's flight provided reasonable suspicion that defendant had committed, or was about to commit, a crime. Thus, the stop was justified.

¶ 40                                    III. CONCLUSION

¶ 41     For the reasons stated, we affirm the denial of the suppression motion and defendant's resulting conviction.

¶ 42     Affirmed.