2021 IL App (2d) 200350-U
No. 2-20-0350
Order filed August 4, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Lake County. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 18-CF-1857 |
| | ) | |
| CHRISTOPHER L. PROFIT, | ) ) | Honorable George D. Strickland, |
| Defendant-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE ZENOFF delivered the judgment of the court.
Justices Jorgensen and Schostok concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The order granting the defendant's motion to suppress evidence was reversed where the police officers had valid bases to conduct a *Terry* stop and to frisk the defendant for weapons. Even if the frisk could not be justified as a *Terry* frisk, the inevitable-discovery doctrine applied.

¶ 2   The State charged defendant, Christopher L. Profit, with seven offenses stemming from his possession of a firearm. The trial court granted defendant's motion to suppress evidence. The State filed a certificate of impairment and appeals. We reverse and remand for further proceedings.

¶ 3                                    I. BACKGROUND

¶ 4   The evidence at the hearing on defendant's motion to suppress consisted of three officers'

body camera footage, an audio recording of police dispatch communications, and the testimony of Officer Muhammad Alka of the North Chicago Police Department. To explain the circumstances leading to the discovery of the firearm, we will first describe what can be seen and heard on the various recordings. We will then supplement the facts by reference to Alka's testimony.

¶ 5                                A. Events on the Recordings

¶ 6     Around 1:40 a.m. on August 11, 2018, police officers were dispatched to the area of 14th Street and Sheridan Road in North Chicago in response to a report from "rescue" (North Chicago's emergency medical services) of a "possible intoxicated motorcycle driver." The subject was reported as being a black male, wearing black, travelling southbound.

¶ 7     Multiple officers arrived at the scene. They observed an unattended motorcycle parked on a sidewalk at the intersection of 14th Street and Sheridan Road. Sergeant Eric Martin radioed dispatch to identify the owner of the motorcycle and to ascertain the status of the owner's license. Officer Micah Cress arrived at the intersection and encountered Martin. Cress's body camera footage depicts the parked motorcycle but does not show any portion of any officer's encounter with defendant. There is no body camera footage from Martin.

¶ 8     Meanwhile, Officers Alka, Keith Farrell, and Juan Laracuente encountered an African American male, later identified as defendant, walking on the sidewalk half a block north of the motorcycle. Alka and Farrell both activated their body cameras. The emergency lights of Laracuente's squad car were activated by the time that Alka's and Farrell's body camera footage began recording. There is no body camera footage from Laracuente. On the video, there does not appear to be anybody in the vicinity other than defendant and the police officers. The area was dark and was illuminated primarily by the lights from the squad cars and the officers' flashlights.

¶ 9    As Alka exited his squad car and encountered defendant, defendant was walking northbound down the sidewalk with his hands in the pockets of his motorcycle jacket. A metal fence was west of defendant, and a strip of grass separated the sidewalk from the road to the east of defendant. Defendant was dressed all in black. As he was walking, defendant said something about an "earpiece." Laracuente, who was standing by the driver's side of his squad car just south of Alka's squad car, asked defendant, "What color is it?" Defendant responded, "black." As Alka began his conversation with defendant, Laracuente walked toward the grass alongside the road, southeast of defendant. Laracuente shined his flashlight on the ground in the area where defendant had been walking, apparently searching for an earpiece. Farrrell walked northbound on the sidewalk south of defendant.

¶ 10    Alka approached defendant and said, "Take your hands out of your pockets, please." Defendant complied but continued to walk down the sidewalk. Alka then said, "Alright, can you hold on a second?" Defendant looked at Alka but did not respond, and defendant continued walking. Alka repeated, "Can you hold on a second?" Defendant stopped, turned around toward Alka, and said that he was not bothering anybody and that he was just looking for his "earpiece." Alka said, "we want to talk to you, okay?" Defendant turned around again and started walking away from Alka. Alka asked defendant if he had any "ID" with him. Defendant, walking away from Alka, responded, "no." Alka repeated, "Can I see your ID please?" Defendant responded that he did not have his identification. Alka asked defendant if he could "stop walking for a second," adding: "I've got to talk to you." Defendant continued to walk. Alka told defendant to "stop walking, man" and to "hold on." Defendant stopped on the sidewalk, and Alka approached him.

¶ 11    Alka asked defendant if he "had a name." Defendant paused for a moment before asking, "what's the problem officer?" By this time, defendant was surrounded by three officers: Alka to

the east, Farrell to the north, and Laracuente to the south. Alka told defendant that the police received a call about "you and a motorcycle." Alka asked defendant if that was his "motorcycle over there." Defendant responded that it was. He told Alka that his Bluetooth flew off as he was riding and that he got off the motorcycle to look for the device.

¶ 12    Around this time, the dispatcher advised the officers that the motorcycle was registered to Christopher Profit. The dispatcher added, "1080, prior parolee." (According to Alka's testimony, this meant that, per the Law Enforcement Agencies Data System (LEADS), defendant was a gang member and had once been on parole.)[1]

¶ 13    Alka again asked defendant whether he had any "ID" with him. Defendant responded that he did not. Alka asked defendant his name. Defendant responded, "my name is—," before trailing off and starting to walk down the sidewalk again. Alka told defendant to stop walking. Farrell stepped in front of defendant and said: "hold on partner." Defendant stopped. Alka told defendant that he was "not free to go right now."

¶ 14    Defendant asked what the problem was. Alka said that he had to talk to defendant, and Alka again asked defendant his name. Defendant paused and again asked what the problem was. Alka asked defendant for his name once more. Defendant shrugged, put his hands in his pants pockets, then put his right hand into his jacket pocket, and took out his phone. Defendant asked, "Now what's the problem with me and my bike?" Alka asked defendant: "Is your name on your

---

[1] The parties dispute whether the dispatcher said "1080, prior parolee" before or after defendant was frisked. The parties are both right. The dispatcher said this prior to the frisk, and she repeated it one minute and forty seconds after the officers found the firearm in defendant's jacket.

phone?" Alka then told defendant that it was not a problem if defendant wanted to start recording the encounter.

¶ 15    Farrell interjected that defendant was "making it a lot harder than it needs to be." Farrell added that they were trying to get defendant's driver's license, make sure that he was okay, make sure that he did not fall off his bike, and then defendant would be "out of here." Defendant responded, "No, I was just at the gas station."

¶ 16    Around this time, the dispatcher advised the officers that the person to whom the motorcycle was registered had a "D" class license but did not have a motorcycle endorsement—*i.e.*, a license to operate a motorcycle.

¶ 17    Farrell told defendant to give Alka his name and then they would get out of defendant's way. Alka said: "We got called here for a reason, that's all." Defendant then said that his name was Christopher Profit and that he was looking for his earpiece, which flew off while he was riding his bike. Alka asked defendant to spell his first and last names and to provide his date of birth. Defendant complied. Defendant again indicated that he was looking for his earpiece, which had fallen off "right here." As defendant said this, he gestured toward the street.

¶ 18    Alka then asked defendant, "You don't have any weapons on you do you by chance? Knives, pistols, anything like that?" Defendant started to walk away from the officers toward the street as he said, "no officer." Alka told defendant to "hold on" multiple times and grabbed defendant's arm as defendant stepped into the street.

¶ 19    Alka told defendant that they were going to pat him down to make sure that he had nothing on him. Alka asked defendant if he had anything on him. Defendant responded that he did not. Defendant repeatedly asked Alka why Alka was grabbing him. Alka repeatedly told defendant not

to pull away, before telling defendant to "stop." As Farrell frisked defendant's jacket, Alka again asked defendant if he had any weapons on him. Defendant responded calmly, "I'm cool."

¶ 20    It appears that Farrell and Alka then attempted to put defendant's hands behind his back as defendant said, "come on man." Alka told defendant not to resist. Alka pulled out his taser and told Farrell and Laracuente to let defendant go. Alka repeatedly shouted "taser" and directed defendant to put his hands behind his back. Defendant put his arms up. As defendant had his arms up and was standing still, Alka tased him on the right side of his torso. Defendant fell to the ground and rolled over onto his stomach. Around this time, Martin and Cress approached defendant and the other officers, so there were five officers in total around defendant.

¶ 21    Farrell and Laracuente attempted to put handcuffs on defendant. Farrell told the other officers at the scene that there was something in defendant's front left pocket. Farrell and Laracuente had trouble getting the handcuffs on defendant, and someone said that defendant was resisting. Alka placed the taser against defendant's leg and tased defendant a second time. Once Farrell and Laracuente handcuffed defendant, they rolled him onto his back. Farrell searched defendant's jacket and found a .45 caliber firearm in a zipped left interior pocket. At this point, approximately four and a half minutes had passed since Alka and Farrell first encountered defendant.

¶ 22                              B. Alka's Testimony

¶ 23    There are a few points that warrant mentioning from Alka's testimony.

¶ 24    Alka confirmed that the only information that he had when he responded to the vicinity of 14th Street and Sheridan Road was what he heard through dispatch. Alka explained that he had worked with rescue personnel "[w]ell over a hundred times" in his career and that he knew most of them. Alka explained that, after defendant was arrested, another officer was able to identify the

rescue worker who made the initial report of a "possible intoxicated motorcycle driver." Alka had his dispatch radio on his left shoulder during the encounter with defendant.

¶ 25    Alka testified that the area in question was a business district that was surrounded by commercial parking lots, buildings, and an iron fence. It was uncommon to see people walking the streets at this hour, as many businesses were closed. Alka said that this area was known for drug deliveries, gang activity, and shootings. A gas station just north of this location had been robbed several times too.

¶ 26    Alka testified that, when he arrived at the scene, he observed a motorcycle that was turned off and parked on the sidewalk "immediately in front of a designated crosswalk." According to Alka, the motorcycle was facing southbound, which was the subject's direction of travel reported by dispatch. Alka believed that the way this motorcycle was parked violated section 11-1303 of the Illinois Vehicle Code (625 ILCS 5/11-1303 (West 2018)). In relevant portion, that statute prohibits parking a vehicle on a sidewalk, "[e]xcept when necessary to avoid conflict with other traffic, or in compliance with law or the directions of a police officer or official traffic-control device." 625 ILCS 5/11-1303(a)(1)(b) (West 2018). Alka acknowledged that he did not write in his police report that the motorcycle was parked on the sidewalk or that it was parked illegally. He also did not personally write defendant a parking ticket, though he did not know whether another officer wrote one. Alka testified that he believed that the curb surrounding the corner where the motorcycle was parked was painted yellow, which indicated that there was no street parking. Alka believed that there would have been parking available to defendant at the open gas station further north down the street. There was also a shoulder to park on "on the east side of the street closer to 13th Street."

¶ 27    Alka testified that he spotted defendant walking northbound on a sidewalk on Sheridan Road, approximately half a block away from the motorcycle. Defendant matched the description from dispatch as a black male with black clothing. During Alka's subsequent conversation with defendant, defendant said that he did not have identification on him. Alka believed that this violated section 6-112 of the Illinois Vehicle Code (625 ILCS 5/6-112 (West 2018)), which requires motorists to have their licenses in their immediate possession while operating a motor vehicle. Alka believed that defendant also violated the law by driving a motorcycle without a valid motorcycle license. Alka testified that, had the incident not escalated the way that it did, he would have arrested defendant based on not having a valid license on him and operating a motorcycle without a motorcycle license. Alka acknowledged that he did not write in his police report that defendant lacked a motorcycle license, nor did Alka know whether defendant received a ticket for that offense. Asked generally whether he would arrest somebody for class B misdemeanors or petty offenses, he said that it would depend on the facts, including the individual's behavior and cooperation.

¶ 28    Alka explained that defendant's statements about looking for a Bluetooth device did not make sense, given that defendant was looking for the device on the sidewalk rather than on the road and that defendant was attempting to locate the device in pitch black without using any artificial lighting. Alka thought that it would have been more reasonable for defendant to have "pull[ed] his motorcycle around to look for" the device.

¶ 29    Alka suspected that defendant "might have been under the influence of something," as defendant was very uncooperative and his actions and statements "did not make clear sense." Although Alka was unable to determine that there was probable cause to believe that defendant was under the influence of alcohol, Alka observed "possible indicators of intoxication." Alka also

believed that defendant "was at some point attempting to flee," as defendant attempted to walk away when Alka asked him his name.

¶ 30    Alka testified that the dispatcher did not inform him that defendant had a valid Firearm Owners Identification card or a concealed carry permit. Dispatch normally would advise Alka if a suspect had such card or permit. According to Alka, he believed prior to the frisk that defendant may have been armed. One basis for Alka's belief was that defendant consistently walked away from him, which made him think that defendant was "attempting to be evasive for a particular reason." Alka also cited defendant's "reluctance to give his name" as another basis for the belief that defendant may have been armed. Another reason that Alka mentioned was that it "definitely increased the caution in the air" when the dispatcher informed him that defendant was a prior parolee and a gang member. Alka testified that he wanted to perform a pat down of defendant for the safety of himself and others at the scene.

¶ 31    Alka testified that his belief that defendant may have been armed "increased" when defendant started to walk away after Alka mentioned weapons and doing a pat down. According to Alka, he believed at the time that defendant "was being evasive and was going to attempt to flee." Alka explained that, when he placed a hand on defendant and told him to stop, defendant's body "tensed up," and defendant asked Alka why he was grabbing him. Alka characterized defendant's tone of voice as "aggressive" and "notably combative" without shouting. Additionally, defendant's right arm "definitely tensed up," though defendant did not yank away from Alka. When Farrell quickly approached defendant, defendant "started pulling his arm away." Farrell then pat defendant down. After doing so, Farrell gave Alka a "nonverbal cue" that defendant was armed. Alka testified that nonverbal cues were common among officers so as not to provoke an irrational response from a suspect.

¶ 32    Alka described how defendant resisted the officers' attempts to put his hands behind his back, which resulted in Alka tasing him. Once defendant was on the ground, he still was not cooperative. The officers got defendant in handcuffs and then found the firearm in defendant's jacket pocket.

¶ 33                          C. The Trial Court's Ruling

¶ 34    The court granted defendant's motion to suppress evidence. We discern the court's reasoning by combining the court's explanation during its initial ruling with its explanation on a subsequent date (the court directed the parties to submit additional case law to address some questions that the court identified in its initial ruling).

¶ 35    The court determined that the "*Terry* stop" (see *Terry v. Ohio*, 392 U.S. 1 (1968)) began at the outset of the encounter, when Laracuente activated his emergency lights. The court explained: "A reasonable person would not have believed that the police by putting on their emergency lights were giving him anything other than a directive to stay where he was, and in fact that was fortified by them telling him to stay where he was."

¶ 36    The court seemingly found that the initial report from rescue regarding a possibly intoxicated motorist, though not an anonymous tip, did not justify the officers to conduct the *Terry* stop. The court recognized that, although there was no indication as to why the rescue worker believed that a motorcycle driver was intoxicated, the tip was reliable insofar as the responding police officers observed at the scene a motorcycle and an African American male wearing black. The court determined that, although case law indicates that the corroboration requirements for tips are relaxed in cases involving potentially impaired drivers, the corroboration requirements are not relaxed in cases such as this one, where the defendant is not driving a vehicle when the police encounter him.

¶ 37    The court further determined that the responding officers did not have a reasonable suspicion that defendant violated section 11-1303 of the Illinois Vehicle Code by parking on the sidewalk. According to the court, the officers were not conducting a "plausible investigation" of that offense. On this point, the court reasoned that "there were no parking places" in the area and there was "no place to put the motorcycle other than on a sidewalk." According to the court, although it was an affirmative defense to section 11-1303 of the Illinois Vehicle Code that a person had nowhere else to park, the police officers here could see that defendant did not have anywhere else to park.

¶ 38    Notwithstanding the court's finding that defendant was seized at the outset of the encounter without reasonable suspicion, the court recognized that the officers quickly determined, upon speaking to defendant, that he lacked identification. The court said that this lack of identification "would cause a reasonable suspicion" that defendant may have committed various traffic offenses. The court determined that the police officers were "entitled to investigate the license issue" and that defendant made that investigation "very difficult" by being uncooperative. The court found that the officers could have arrested defendant and charged him with driving without a valid driver's license. In the court's view, however, the officers did not arrest defendant "until much later" during the encounter.

¶ 39    The court disagreed with Alka's assessment during his testimony that defendant's manner of parking his motorcycle and searching for his Bluetooth device "showed a lack of judgment which could be consistent with intoxication." The court noted that it "did not observe any indicia" on the body camera footage that defendant was intoxicated. According to the court, defendant's manner of looking for the Bluetooth device was reasonable and did not provide "any form of probable cause."

¶ 40    The court further determined that there was no basis for the officers to frisk defendant. The court acknowledged that North Chicago generally is a high-crime area. Additionally, the court recognized that it might in some cases be "concerning" for a person to walk through a business district in the middle of the night when most businesses are closed. However, the court noted that there were no burglary reports here, nor could officers have reasonably inferred that defendant planned to commit a robbery.

¶ 41    Presumably referring to what the court observed on the body camera footage, the court also found that defendant did nothing "with his hands to lead the police to believe that he was armed." In a similar vein, the court noted that there were no visible "bulges" on defendant's clothing that could have indicated that he was armed. Nor would defendant's "reticence in identifying himself" to the police officers cause them to believe that he was armed.

¶ 42    The court recognized that the officers received information from dispatch that defendant was "both a gang member and a parolee." The court noted, however, that the dispatcher provided "very little information" about defendant's gang membership and did not specify defendant's criminal history that led to him being on parole. In its initial ruling, the court noted that police officers are entitled to rely on information from LEADS. The court requested the parties to provide additional cases to the court addressing "the weight the court should give to the fact that [defendant] was known to be or believed to be a gang member and a convicted felon." At the following court date, however, the court did not specifically comment on the fact that the police officers knew that defendant was a convicted felon and a gang member. Instead, the court determined that the frisk "was based solely on the fact that the defendant was not being particularly cooperative[,] which is not a basis for a frisk."

¶ 43    The court denied the State's motion for reconsideration. As part of its brief explanation for its ruling, the court added to its reasoning that the community-caretaking doctrine did not apply here. The State filed a certificate of impairment and a timely notice of appeal.

¶ 44                              II. ANALYSIS

¶ 45    On appeal, the parties disagree on the following overarching issues: (1) when defendant was "seized" during the encounter, (2) whether the officers were justified in conducting a *Terry* stop, (3) whether the officers had a valid basis to frisk defendant for weapons, and (4) whether, if the frisk was unjustified, the inevitable-discovery doctrine applies.

¶ 46    When reviewing a ruling on a motion to suppress evidence, we will not disturb the trial court's findings of historical fact unless such findings are against the manifest weight of the evidence. *People v. McDonough*, 239 Ill. 2d 260, 266 (2010). Nevertheless, we are free to undertake our own assessment of the facts in relation to the issues presented, and we may draw our own conclusions when deciding what relief should be granted. *McDonough*, 239 Ill. 2d at 266. "[W]e review *de novo* the ultimate question of whether the evidence should be suppressed." *McDonough*, 239 Ill. 2d at 266.

¶ 47    At the outset, we reject the State's attempt to portray Alka's interactions with defendant as a consensual encounter. The body camera footage does not support a conclusion that Alka attempted to initiate a consensual encounter. Instead, with emergency lights flashing, multiple officers approached the area where defendant was walking down the sidewalk. There were no other civilians around. Alka immediately ordered defendant to remove his hands from his pockets. When defendant showed little interest in speaking with Alka and attempted to walk away, Alka nevertheless ordered defendant to stop. These are not the hallmarks of a consensual encounter. See

*McDonough*, 239 Ill. 2d at 268 (consensual encounters involve "no coercion or detention" and thus do "not implicate any fourth amendment interests").

¶ 48    Even more misguided is the State's attempt to justify the seizure of defendant as the product of a community-caretaking encounter. In his testimony, Alka never suggested that he was acting in a community-caretaking capacity, nor did Alka ask defendant at the scene whether he needed assistance. One of the characteristics of a community-caretaking encounter is that the officers were "performing some function other than the investigation of a crime." *People v. Slaymaker*, 2015 IL App (2d) 130528, ¶ 16. Here, Alka obviously was investigating whether defendant was engaged in criminal activity. From Alka's first communications with defendant, the encounter was an attempt at a "*Terry* stop," and we will analyze the facts within that framework. See *McDonough*, 239 Ill. 2d at 268 (*Terry* stops are brief seizures, short of an arrest, for the purpose of investigating suspicions of criminal activity).

¶ 49    Despite our rejection of some of the State's arguments, for the following reasons, we reverse the order granting defendant's motion to suppress, and we remand the matter for further proceedings.  We hold that defendant was seized when he submitted to Alka's order to "stop." We further hold that, when defendant was seized, the officers had a valid basis to conduct a *Terry* stop due to their observation of a motorcycle parked on the sidewalk and because there was reason to suspect that defendant had operated a motorcycle without a license in his immediate possession. Additionally, we hold that, based on the events that unfolded during the *Terry* stop, the officers had a valid basis to frisk defendant. Even if the frisk could not be justified as a *Terry* frisk, the inevitable-discovery doctrine applies, so the evidence of the firearm need not be excluded.

¶ 50                          A. When Defendant was Seized

¶ 51   "The conduct constituting the stop under *Terry* must have been justified at its inception." *People v. Thomas*, 198 Ill. 2d 103, 109 (2001). Thus, we must first determine when the *Terry* stop began—*i.e.*, the moment when defendant was "seized."

¶ 52   The trial court determined that the seizure occurred at the beginning of the encounter, even before the officers' body cameras began recording, when Laracuente activated his emergency lights. Defendant embraces that view, but he also argues alternatively that he was seized when he complied with Alka's command to remove his hands from his pockets. The State, by contrast, argues that defendant was not seized until later in the encounter, when Alka grabbed defendant's arm to prevent him from walking away. For the following reasons, our conclusion regarding when the seizure began diverges from the views espoused by the parties and the trial court.

¶ 53   "For purposes of the fourth amendment, an individual is 'seized' when an officer 'by means of physical force or show of authority, has in some way restrained the liberty of a citizen.' " (Internal quotation marks omitted.) *People v. Luedemann*, 222 Ill. 2d 530, 550 (2006) (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). "To determine whether a seizure occurred, '[w]e look to the totality of the circumstances to determine whether a reasonable person would feel free to leave under the circumstances.' " *People v. Shipp*, 2015 IL App (2d) 130587, ¶ 32 (quoting *People v. Beverly*, 364 Ill. App. 3d 361, 370 (2006)). Factors that may indicate a seizure include: "(1) the threatening presence of several officers; (2) the display of a weapon by an officer; (3) some physical touching of the person of the citizen; and (4) the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Luedemann*, 222 Ill. 2d at 553. This is not an exhaustive list, so a seizure may also occur based on "other coercive police behavior." *Luedemann*, 222 Ill. 2d at 557. Though activation of a squad car's emergency lights is "not *per se* an act of crime detection" (*People v. Dittmar*, 2011 IL App (2d) 091112, ¶ 27), such

behavior generally constitutes a show of police authority that commences a seizure. See *Village of Mundelein v. Minx*, 352 Ill. App. 3d 216, 220 (2004) (a reasonable person in the defendant's position would not have felt free to walk away when an officer activated his emergency lights); see also *McDonough*, 239 Ill. 2d at 271 (the State conceded that the defendant was seized when an officer activated his emergency lights, so the supreme court declined to decide whether the use of emergency lights "always constitutes a seizure within the fourth amendment").

¶ 54    Here, defendant was walking down the sidewalk when multiple police officers arrived at the scene in squad cars, one of which had its emergency lights activated. There were no other civilians walking in the area, so a reasonable person in defendant's position would have believed that the lights were directed toward him. Even if Laracuente's activation of his lights did not reflect an intent to initiate a *Terry* stop, Alka then approached defendant and said, "Take your hands out of your pockets, please." A compelling argument could be made that, by this point, a reasonable person in defendant's position would not have felt free to leave.

¶ 55    But that does not end our inquiry. Even where a police officer exhibits a show of authority that would lead a reasonable person to believe that he is not free to leave, a seizure does not occur until the suspect submits to the assertion of authority. See *Thomas*, 198 Ill. 2d at 112. This rule traces its origins to a case where a suspect fled from the police officers who were attempting to effectuate a seizure. See *California v. Hodari D.*, 499 U.S. 621, 629 (1991). However, the rule has also been applied in circumstances where a suspect does not flee from officers. See, *e.g.*, *People v. Evans*, 2017 IL App (4th) 140672, ¶¶ 30-31 (even if an officer's request for the defendant to remove his hands from his pockets was a show of authority, the defendant resisted this authority, and did not fully submit to it, where the defendant complied but then put his hands back in his pockets).

¶ 56 " '[W]hat may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away.' " *People v. Cherry*, 2020 IL App (3d) 170622, ¶ 31 (quoting *Brendlin v. California*, 551 U.S. 249, 262 (2007)). Lower federal courts have ruled that "a brief or momentary pause prior to flight does not amount to submission to authority," whereas "a momentary yield, accompanied by more, such as an attempt to converse with the officer, may amount to a submission." *Cherry*, 2020 IL App (3d) 170622, ¶ 32 (collecting cases).

¶ 57 When the officers' body camera footage began recording, defendant was walking down the street with his hands in his pockets, apparently saying something to Laracuente about the color of his Bluetooth device. Alka approached and told defendant to remove his hands from his pockets. Defendant complied but continued walking down the sidewalk. Alka then requested that defendant "hold on a second." Defendant ignored Alka and continued walking down the sidewalk.

¶ 58 We cannot say that defendant's actions to this point in the encounter reflected even a momentary yield to Alka's authority. Defendant argues that he submitted to the *Terry* stop when he took his hands out of his pockets on Alka's command, even though he failed to stop walking and he ignored Alka's request for him to stop. The premise of defendant's argument does not hold water. See *United States v. Lowe*, 791 F.3d 424, 433 (3rd Cir. 2015) ("When an officer effectuates a *Terry* stop, his or her 'show of authority' is an implicit or explicit command that the person *stop*." (Emphasis in original)). We are unaware of any authority supporting that a person can submit to a *Terry* stop without stopping.

¶ 59 Defendant relies on *People v. Jackson*, 389 Ill. App. 3d 283 (2009), in support of his argument that he was seized when he removed his hands from his pockets in compliance with

Alka's command. In *Jackson*, after being told three or four times to remove his hands from his pockets, the defendant complied with the officer's command. *Jackson*, 389 Ill. App. 3d at 284. As the defendant removed his hands from his pockets, he dropped a gun to the ground. *Jackson*, 389 Ill. App. 3d at 284. The defendant then fled from the officer before being arrested. *Jackson*, 389 Ill. App. 3d at 285. Based on these facts, the appellate court affirmed an order granting the defendant's motion to suppress evidence. The court concluded that the police officer seized the gun from the defendant "as a result of the defendant's submission to authority." *Jackson*, 389 Ill. App. 3d at 289. In the court's view, because the defendant's act of removing the gun from his pocket was the result of an unlawful seizure, it did not "make[ ] any difference" that the defendant then fled from the officer. *Jackson*, 389 Ill. App. 3d at 288.

¶ 60    *Jackson* is distinguishable because defendant here failed to stop walking as he removed his hands from his pockets. Moreover, unlike in *Jackson*, the police officers here did not discover the gun in defendant's possession at the precise moment when he complied with the command to remove his hands from his pockets. Thus, we cannot say that the officers discovered defendant's possession of the gun due to his compliance with the command to remove his hands from his pockets.

¶ 61    Turning back to the encounter here, Alka repeated: "Can you hold on a second?" This time, defendant stopped, turned toward Alka, and said that he was not bothering anybody and that he was just looking for his "earpiece." Alka said, "we want to talk to you, okay?" Defendant turned around again and started walking away from Alka. Alka asked defendant if he had any identification with him. Defendant, still walking, responded, "no." Alka followed defendant and repeated, "Can I see your ID please?" Defendant responded that he did not have his identification. Alka asked defendant if he could "stop walking for a second." Defendant continued to walk away.

Alka told defendant to "stop walking, man." Defendant finally stopped and soon was surrounded by three police officers.

¶ 62    We hold that defendant submitted to police authority—and the seizure began—when Alka ordered defendant to "stop walking, man," defendant complied with that request, and three officers surrounded him. The State argues that defendant "never submitted to the officers' show of authority." We reject that argument. To conclude that defendant never submitted to the officers' show of authority would require us to ignore that defendant, albeit reluctantly, provided his name and date of birth to the officers while he was surrounded and, for the most part, remained stationary. Nevertheless, we will take defendant's behavior into consideration later in the analysis when determining whether the officers had a valid basis to frisk him.

¶ 63                    B. Whether the *Terry* Stop was Valid

¶ 64    The next question is whether the officers had a valid basis to conduct a *Terry* stop when the seizure began. For the following reasons, we hold that they did.

¶ 65    The rule of *Terry v. Ohio*, 392 U.S. 1 (1968), has been codified in section 107-14(a) of the Code of Criminal Procedure of 1963 (Code):

> "A peace officer, after having identified himself as a peace officer, may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense as defined in Section 102-15 of this Code, and may demand the name and address of the person and an explanation of his actions. Such detention and temporary questioning will be conducted in the vicinity of where the person was stopped." 725 ILCS 5/107-14(a) (West 2018).

¶ 66    As mentioned above, "[t]he conduct constituting the stop under *Terry* must have been justified at its inception." *Thomas*, 198 Ill. 2d at 109. In considering whether a *Terry* stop was justified at its inception, "[a] court objectively considers whether, based on the facts available to the police officer, the police action was appropriate." *Thomas*, 198 Ill. 2d at 109. To that end, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences therefrom, reasonably warrant that intrusion." *Thomas*, 198 Ill. 2d at 109. Moreover:

> "Viewed as a whole, the situation confronting the police officer must be so far from the ordinary that any competent officer would be expected to act quickly. The facts supporting the officer's suspicions need not meet probable cause requirements, but they must justify more than a mere hunch. The facts should not be viewed with analytical hindsight, but instead should be considered from the perspective of a reasonable officer at the time that the situation confronted him or her." *Thomas*, 198 Ill. 2d at 110.

¶ 67    The parties dispute whether the rescue worker's report of a "possible intoxicated motorcycle driver" justified defendant's detention pursuant to *Terry*. We need not reach that issue. We hold that the *Terry* stop was justified at its inception because the police officers had a reasonable suspicion that defendant illegally parked his motorcycle and operated the motorcycle without a license in his possession.

¶ 68    Section 11-1303(a)(1)(b) of the Illinois Vehicle Code provides that no person shall park a vehicle on a sidewalk, "[e]xcept when necessary to avoid conflict with other traffic, or in compliance with law or the directions of a police officer or official traffic-control device." 625 ILCS 5/11-1303(a)(1)(b) (West 2018). Here, police officers were dispatched around 1:40 a.m. to a location for a report involving a black motorcycle driver dressed in black. When officers arrived

at the scene shortly thereafter, they observed a motorcycle parked entirely on the sidewalk between a crosswalk and a traffic light. They also observed defendant—who matched the description provided by dispatch and was wearing a motorcycle jacket—walking half a block away. From the officers' body camera footage, there did not appear to be any other civilians walking in the area. Under these circumstances, a reasonable police officer would have deduced that it was defendant who parked the motorcycle on the sidewalk.

¶ 69     Given the hour and that there was minimal other traffic around, a reasonable police officer also would have suspected that defendant did not need to park on the sidewalk and leave the motorcycle turned off and unattended to "avoid conflict with other traffic." 625 ILCS 5/11-1303(a) (West 2018). The trial court did not explicitly make any finding to the contrary. Nor was there any indication that defendant had parked on the sidewalk to comply with "law or the directions of a police officer or official traffic-control device." 625 ILCS 5/11-1303(a) (West 2018). Accordingly, the officers had a reasonable suspicion that defendant illegally parked his motorcycle, which justified a *Terry* stop.

¶ 70     In finding to the contrary, the trial court reasoned that the police officers could see that "there were no parking places" in the area and that there was "no place to put the motorcycle other than on a sidewalk." The statute does not say, however, that motorists may park on a sidewalk so long as there are no parking places around. At any rate, Alka testified that there was parking available at an open gas station down the street and also on the shoulder "on the east side of the street closer to 13th street." The trial court further mentioned that there was not a "plausible investigation" of a parking violation. That finding ignores that, while Alka and two other officers interacted with defendant, Martin communicated with dispatch to ascertain the owner of the motorcycle and to determine whether the owner had a valid license.

¶ 71    Moreover, the question is not whether defendant violated the statute but whether the officers' observation of the motorcycle on the sidewalk justified approaching defendant for investigative purposes. See *People v. Chatmon*, 236 Ill. App. 3d 913, 924 (1992) ("Although both parties wish to debate whether defendant violated section 11-1303(a)(1)(j) of the Illinois Vehicle Code, such a determination need not be made for purposes of determining whether the gun seized from defendant must be suppressed. The key question is whether Officer Jocson had a reasonable, articulable suspicion of criminal activity such that he could approach the vehicle."). Here, the officers were "within constitutional bounds" to approach defendant for investigative purposes. *Chatmon*, 236 Ill. App. 3d at 925.

¶ 72    Aside from the potential parking violation, immediately prior to the seizure, defendant told Alka that he did not have any identification on him. This gave rise to a reasonable suspicion that defendant also violated section 6-112 of the Illinois Vehicle Code, which requires motorists to have their license or permit in their "immediate possession at all times when operating a motor vehicle." 625 ILCS 5/6-112 (West 2018).

¶ 73    Accordingly, the *Terry* stop here was justified at its inception.

¶ 74          C. Whether the Officers had a Valid Basis to Frisk Defendant

¶ 75    We next address whether the police officers had a valid basis to frisk defendant. We determine that the events that unfolded during the *Terry* stop justified the officers to conduct the frisk.

¶ 76    "Authority to effect a *Terry* stop does not automatically confer authority to frisk an individual." *People v. Linley*, 388 Ill. App. 3d 747, 753 (2009). However, "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," the officer has "the power to

take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Terry*, 392 U.S. at 24. To justify a frisk, " 'the officer must reasonably believe that the defendant is armed and dangerous.' " *Shipp*, 2015 IL App (2d) 130587, ¶ 43 (quoting *People v. Davis*, 352 Ill. App. 3d 576, 580 (2004)). This means that " 'a reasonably prudent person, when faced with the circumstances that the police confronted, would have believed that his safety or the safety of others was in danger.' " *Shipp*, 2015 IL App (2d) 130587, ¶ 43 (quoting *Davis*, 352 Ill. App. 3d at 580). Any such frisk must be limited to determining whether the suspect is armed. *Shipp*, 2015 IL App (2d) 130587, ¶ 43.

¶ 77    During the *Terry* stop, the officers learned from dispatch that defendant did not have a valid motorcycle license. At this point, the officers had probable cause to arrest defendant and to search him incident to that arrest. See 625 ILCS 5/6-101(b) (West 2018) ("No person shall drive a motor vehicle unless he holds a valid license or permit, or a restricted driving permit ***."); 625 ILCS 5/6-104(a) (West 2018) ("No person shall operate a motor vehicle unless such person has a valid license with a proper classification to permit the operation of such vehicle ***."); see also *People v. Jalinsky*, 205 Ill. App. 3d 651, 654-55 (1990) (a police officer was justified in arresting the defendant for driving a motorcycle without having the proper class of license and then searching the defendant incident to that arrest). Indeed, Alka testified that, had the encounter with defendant not escalated the way that it did, he would have arrested defendant anyway for driving without a motorcycle license and for not having his drivers' license (a class D license) in his possession. The fact that defendant was never formally charged with these offenses does not preclude us from determining that probable cause existed for an arrest. See *People v. Johnson*, 408 Ill. App. 3d 107, 126 (2010).

¶ 78    Nevertheless, the officers here did not arrest defendant as soon as they had probable cause to do so. Instead, Alka apparently wanted to continue his investigation, and the State attempts to justify the frisk of defendant's person through the lens of *Terry* rather than as a search incident to arrest. We hold that, based on what the officers knew about defendant and their observations of his behavior, they were reasonable in believing that a frisk was appropriate for their own safety. See *Evans*, 2017 IL App (4th) 140672, ¶ 45 (even if certain factors, when taken alone, do not give rise to a reasonable suspicion that an individual is armed, the court must consider the factors together as part of the totality of the circumstances).

¶ 79    During the *Terry* stop, the officers learned from dispatch that defendant was a prior parolee and, according to LEADS, a gang member. Alka testified that those facts "definitely increased the caution in the air." Additionally, when interacting with the police officers, defendant conducted himself in a manner that could have led a reasonable officer to consider him a flight risk. For example, as Alka calmly attempted to convince defendant to identify himself, defendant trailed off in mid-sentence and started to walk away. Later during the encounter, Alka asked defendant whether he had any weapons on him ("You don't have any weapons on you do you by chance? Knives, pistols, anything like that?"). Alka was entitled to ask that question, and defendant does not argue to the contrary. See *People v. Gonzalez*, 184 Ill. 2d 402, 406, 423 (1998) (prearrest questioning as to whether the defendant was "carrying any guns, needles or knives" did not require *Miranda* warnings). Although defendant responded, "no officer," to Alka's question, defendant simultaneously started to walk away from the three officers toward the street.[2] Alka testified that

_____

[2] The State argues that defendant's attempt to leave the scene would have given the officers probable cause to arrest him for obstruction of a peace officer. Given that we resolve this appeal

he believed that defendant's conduct was evasive and that defendant was "going to attempt to flee."

¶ 80    In his brief, defendant proposes that it is possible that he intended not to flee but to "resume looking for his earpiece." Based on the body camera footage, we determine that a reasonable officer could have interpreted defendant's actions as indicating that he was attempting to leave the scene. Even if defendant merely intended to resume his search for his Bluetooth device, given that this was a valid *Terry* stop, defendant was not free to "leave or [t]o voluntarily terminate" the encounter." *People v. Webb*, 2020 IL App (1st) 180110, ¶ 19.

¶ 81    Alka then grabbed defendant's arm, which was permissible. See *Webb*, 2020 IL App (1st) 180110, ¶ 19 ("If a defendant fails to submit to a lawful attempt at effectuating a *Terry* stop, the officers have the right to take steps to force compliance with their directives in order to effectuate a *Terry* investigative stop in a safe and effective manner."). Alka then informed defendant that the officers were going to pat him down. Alka testified that defendant's right arm "tensed up" and that defendant then used a "notably combative" and "aggressive" tone of voice with Alka. On the video, Alka can be heard repeatedly telling defendant not to pull away, as defendant repeatedly questioned why Alka was grabbing him.

¶ 82    To recap, immediately before the frisk, the police officers knew that defendant was a convicted felon and, according to LEADS, a gang member. They also had probable cause to arrest defendant for driving a motorcycle without a proper license. The officers then observed defendant behave in an evasive manner indicative of potential flight when asked whether he had any weapons. When Alka grabbed defendant's arm to prevent him from leaving, defendant apparently

---

in the State's favor, we need not address that specific argument.

attempted to pull away from Alka. Under the totality of the circumstances, we hold that the officers had a reasonable and articulable suspicion that defendant was presently armed and dangerous, such that they were justified in frisking him for their own safety.

¶ 83    The officers had a valid basis to conduct a *Terry* stop and a valid basis to frisk defendant for weapons. Accordingly, the trial court erred in granting defendant's motion to suppress evidence. But even if the frisk could not be justified through the lens of *Terry*, the inevitable-discovery doctrine applies. " 'For the inevitable discovery doctrine to apply, three criteria must be met: (1) the condition of the evidence must be the same when found illegally as it would have been when found legally; (2) the evidence would have been found by an independent line of investigation untainted by the illegal conduct; and (3) the independent line of investigation must have already begun when the evidence was discovered illegally.' " *People v. Baker*, 2020 IL App (2d) 180300, ¶ 21 (quoting *People v. Shanklin*, 250 Ill. App. 3d 689, 696 (1993)). The doctrine can apply where, prior to an allegedly problematic frisk, police officers had probable cause to arrest the defendant and the officers would have found the contraband incident to an arrest. *Baker*, 2020 IL App (2d) 180300, ¶ 22.

¶ 84    As explained above, here, during a valid *Terry* stop, and prior to the frisk, the officers developed probable cause to arrest defendant for driving a motorcycle without a valid motorcycle license. The evidence showed that, had the incident not escalated the way that it did, Alka could have and would have arrested defendant anyway. Had defendant been searched incident to that arrest, the officers would have found the gun. Under these circumstances, all three requirements of the inevitable-discovery doctrine are met. Specifically, (1) there would have been no change in the gun's condition, (2) the gun would have been found by an independent line of investigation

untainted by any illegality in the *Terry* frisk; and (3) the independent line of investigation had already begun before the officers conducted the *Terry* frisk.

¶ 85   In arguing against the application of the inevitable-discovery doctrine, defendant relies on *People v. Davis*, 352 Ill. App. 3d 576 (2004). *Davis* is distinguishable, as the trial court in that case made a factual finding that the officer would not have arrested the defendant for the underlying minor traffic violation (riding a bicycle without a light) but instead would have issued a citation. *Davis*, 352 Ill. App. 3d at 580. Here, by contrast, Alka testified that he would have arrested defendant for the traffic violations, had the situation not escalated. The trial court did not make a finding that Alka testified incredibly on this point.

¶ 86   Nevertheless, defendant notes that, (1) during the encounter, Alka never mentioned violations of the Illinois Vehicle Code, (2) Alka's police report did not mention such violations, and (3) defendant was never ticketed for such violations. Defendant thus submits that, notwithstanding Alka's testimony to the contrary, Alka "did not have an intention to effectuate an arrest." Defendant asks us to make a credibility assessment, which is not the role of a court of review. See *McDonough*, 239 Ill. 2d at 266 ("[T]he circuit court is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony.").

¶ 87                                 III. CONCLUSION

¶ 88   For the reasons stated, we reverse the judgment of the circuit court of Lake County and remand for further proceedings.

¶ 89   Reversed and remanded.